784 P.2d 290

**Michael D. DUTTON, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Arizona Nursery, Respondent Employer,**

**Fidelity & Casualty Company, Respondent Carrier.**

**No. 1 CA-IC 88-077.**

Court of Appeals of Arizona, Division 1, Department D.

Dec. 12, 1989.

---

Taylor & Schaar by Richard E. Taylor, Phoenix, for petitioner.

Catherine A. Fuller, Chief Counsel, The Industrial Com'n of Arizona, Phoenix, for respondent.

Jones, Skelton & Hochuli by Calvin Harris and Melinda K. Kelley, Phoenix, for respondent employer and respondent carrier.

OPINION

KLEINSCHMIDT, Judge.

This is a special action review of an Industrial Commission award reclosing a claim. The issue is whether a determination of the claimant's lost earning capacity was correct. The administrative law judge concluded that the prior final award, which was based on a stipulated earning capacity, was conclusive. Because the administrative law judge failed to make a finding concerning whether the stipulation was based on a mutual mistake of fact, we set aside the award.

The claimant injured his lower back in 1979 while working as a landscaper. After disc surgery, the injury became stationary in July 1981 with a 10% permanent impairment. The respondent carrier, Fidelity & Casualty Company, then paid tuition and tool expenses for claimant to take a correspondence program in locksmithing.

The claimant subsequently began work as a self-employed locksmith. By December 1981, his lower back symptoms had worsened, and he sought additional medical treatment. On January 18, 1982, the claimant signed a release acknowledging that Fidelity had paid him $1,000 and had agreed to pay him an additional $2,000 "upon receipt of the NO LEC Award" from the Commission. This release also reserved for Fidelity a $3,000 credit against future permanent disability benefits. That same day, the claimant and Fidelity executed and submitted to the Commission a stipulation for entry of an award for no lost earning capacity based on claimant's ability to earn "in excess of $794.16 per month [the average monthly wage]" as a locksmith. The stipulation referred to the fact that the carrier had paid the claimant's tuition for a course in locksmithing and had advanced "additional monies" to the claimant to assist him in starting his business as a locksmith. The claimant was then twenty-six years old, had a high school education, and was unrepresented by counsel.

On March 25, 1982, the Commission issued the requested award, which was explicitly and exclusively based on the stipulation. On April 14, 1982, claimant executed a waiver of rehearing and appeal rights.

The claimant, whose symptoms had persisted, learned that he had a recurrent herniated disc, which his physician related to his previous industrial injury. On April 22, 1982, the claimant petitioned to reopen. *See generally* A.R.S. § 23-1061(H) (1983). After this petition was denied, the claimant retained his current counsel and ultimately prevailed on appeal. *See Dutton v. Industrial Comm'n*, 140 Ariz. 448, 682 P.2d 453 (App.1984). The claimant received medical and temporary disability benefits until April 1986. Fidelity then reclosed the claim with an unscheduled "permanent partial disability" and also provided supportive medical care. These notices did not mention the March 1982 award of no lost earning capacity.

The reclosed claim was referred to the Commission for an earning capacity assessment. *See generally* A.R.S. §§ 23-1044(F) (Supp.1988), 23-1047(A), (B) (1983). After requesting and receiving a functional limitations profile from the treating physician, the Commission issued an award for permanent partial disability based on the capacity to earn only $502.63 per month as a parking lot cashier. This entitled claimant to a benefit of approximately $160 per month.

Fidelity timely protested this award and hearings ensued. Fidelity asserted that claimant's earning capacity was conclusively established by the 1982 stipulation that he could earn "in excess of $794.16" per

month as a locksmith. The claimant accepted the written report of his functional limitations, but attempted to prove that his earning capacity was now less than he had previously stipulated. He and two labor consultants were the only witnesses. The claimant testified that early in 1982 he met with a vocational representative from Fidelity to discuss rehabilitation as a locksmith. According to the claimant, Fidelity represented that he could earn more as a locksmith than he had earned prior to his injury. He explained his understanding of the release and stipulation as follows:

> A. Because, first of all, what I was signing was I thought I was signing just to get some money and that it would not affect my medical in any way.
>
> And as far as any of the wages, one way or another, whether it be my fault or whether I was misled, I don't know. I don't even remember that part of it. I mean, it just didn't even make any sense.
>
> * * * * * *
>
> Q. Okay. What did you understand that document to be at the time you signed it?
>
> A. I can honestly say I don't know. I just know that I thought I was getting into a profession that I was going to be able to make more money than what I made, basically, and it never happened, and I truthfully don't even remember the contents of this.

Furthermore, the claimant could not recall ever receiving the promised additional $2,000.

The claimant also described his actual earnings as a locksmith. He testified that after completing a correspondence course, he applied for employment but was not hired because he lacked experience. He then borrowed some $6,000 to start his own business, but it failed after approximately one year. He apparently did not resume work as a locksmith until the reopened claim was again closed. He testified that around August 1986 he was hired for full-time, regular work as a locksmith. His wage began at $4 an hour, was raised to some $5, and after he agreed to buy part of the business, was increased to $285 a week. He received this weekly amount for some three to four months until he quit for reasons unrelated to the industrial injury.

Claimant's labor consultant conceded that DES data for 1979 established that locksmiths in outlying counties earned on average $797 a month. In his opinion, however, this figure was unrepresentative of claimant's earning capacity because of his inexperience and because the applicable labor market was depressed in 1979. He also testified that based on an interview with an employer in the applicable labor market, the claimant probably would have earned about $650 a month in 1979. Finally, the consultant testified that claimant's 1986 weekly salary of $285 was equivalent to a monthly wage of some $778 in 1979. Fidelity's labor consultant testified that he had interviewed a locksmith working in the applicable labor market in 1979. This source, who had several years of experience, was then earning $5 an hour, and other employers were paying between $5 and $6 an hour.

At the close of this hearing, claimant's counsel made a brief oral argument:

> Our position is that Mr. Dutton's loss of earning capacity should be based upon his employment as a locksmith, as roll backed [sic] to his 1979 date of injury. There are a couple of issues that are tangential to that.
>
> One is a document signed in 1982, approximately, indicating Mr. Dutton's concurrence with a no loss stipulation for which he was allegedly paid some monies. It would be our position that that is not binding at the present time for the reasons that we went into at the time the evidence was taken from Mr. Dutton.
>
> Further, the case had been reopened subsequent to that time and has now been reclosed.
>
> Further, it is our position that any monies paid at that time were paid as rehabilitation expenses and there should be no credit allowed to the carrier for such monies. Mr. Dutton has testified in this regard as well as in terms of what he did receive. Clearly, that was not an agreement that was approved by the In-

dustrial Commission; it was money that the carrier invested in an effort to close the case. And such monies should not represent a credit to the carrier.

Fidelity's counsel responded that the stipulation was binding because the claimant had established neither a change in the suitability of locksmithing nor a change in the availability of this work. The administrative law judge then issued the award for no reduction in earning capacity. Finding no evidence of unsuitability, of unavailability, or of fraud, duress, or coercion, the administrative law judge, in his March 9, 1988, decision, concluded that claimant "is precluded as a matter of law from now claiming that the Stipulation was not supported by the evidence and that he has sustained a loss of earning capacity." In reaching this conclusion, he relied on *Gallegos v. Industrial Comm'n,* 144 Ariz. 1, 695 P.2d 250 (1985), and cited it:

> As long as the prior award is final, whatever was decided is final and so is every fact necessary to that decision.

*Id.* at 4, 695 P.2d at 253.

The claimant requested administrative review, presenting the following argument:

> The Administrative Law Judge has misinterpreted the alleged res judicata impact of the stipulation upon which the case was closed previously. Further, the applicant did testify that he was under severe financial duress when he signed such LEC Stipulation. Further, the defendant carrier breached even such agreement under duress, by failing to pay monies owed to the claimant as part of that stipulation. It is, therefore, requested that the Administrative Law Judge review the decision and look at the facts as to what a locksmith job would have paid as of the date of injury, not the stipulation with an unrepresented applicant under duress as a part of a breached agreement.

After Fidelity responded to claimant's factual allegations, the administrative law judge affirmed the award without substantive change. The claimant then brought this special action.

In his opening brief, the petitioner raises several arguments. We consider them in a different order than that in which they were raised. Rephrased as we understand them, they are: First, petitioner asserts that the administrative law judge failed to fully consider the allegations of fraud or coercion made against the insurance carrier. Second, petitioner alleges that the administrative law judge improperly accorded res judicata effect to the Industrial Commission award, as the underlying stipulation was based upon a mutual mistake of both the claimant and the carrier. Third, petitioner contends that it was unnecessary for him to prove fraud, coercion, or mutual mistake in order to negate the res judicata impact of his stipulation as to no loss of earning capacity. The commission decision that arose from that stipulation was too lacking in meaningful basis, he argues, to achieve preclusive effect.

The claimant's argument that the administrative law judge failed fully to consider the allegations of fraud and coercion merely invites this court to reweigh the evidence. We defer to the administrative law judge's assessment of the record, which supports the factual findings. *See, e.g., Phelps v. Industrial Comm'n,* 155 Ariz. 501, 506, 747 P.2d 1200, 1205 (1987).

We turn then to consider the claimant's second argument, that the administrative law judge ignored the effect of mutual mistake on the stipulation entered into between the claimant and Fidelity. We must say at the outset that the claimant did not focus this argument in the proceedings below. It arises inferentially from the evidence to the effect that the stipulation was based on suppositions that were incorrect and upon the administrative law judge's finding that the carrier had not acted fraudulently. Nonetheless, the issue of mutual mistake is raised and preserved, if barely so. The administrative law judge made no finding as to whether a mutual mistake had occurred or as to the legal effect of such a mistake.

We have previously applied general contract principles to Commission awards based on settlements. In *Field v. Indus-*

*trial Comm'n,* 137 Ariz. 257, 669 P.2d 1034 (App.1983), the injured worker claimed to suffer a loss of earning capacity which the carrier disputed. The parties settled this dispute, and the Commission subsequently issued an award based on a no loss of earning capacity stipulation. The claimant waived his right to rehearing. Within the protest period, however, he requested a hearing alleging mental incompetence and financial duress. This court concluded that a hearing was necessary but that "[s]ince the settlement agreement and execution of the waiver constituted a contract between the parties, the duress or mental incompetency necessary to invalidate those agreements must be sufficient to invalidate a contract." *Id.* at 259, 669 P.2d at 1036.

General contract principles also include relief for mutual mistake. The leading Arizona case is *Dansby v. Buck,* 92 Ariz. 1, 373 P.2d 1 (1962), a personal injury action in which the supreme court concluded that a general release would preclude a claim for a previously undiscovered physical condition only if the parties contemplated, and the releasor assumed, the risk of unknown conditions. *Id.* at 8, 12, 373 P.2d at 6, 8; *see also* 3 A. Corbin, *Corbin On Contracts* § 598 (1960). In this light, the scope of the risk contemplated and assumed is a question of fact. *Dansby,* 92 Ariz. at 8, 373 P.2d at 6; 3 A. Corbin, *supra* §§ 598, 605, 606. *Dansby* is compatible with workers' compensation law, which by statute allows reopening for previously undiscovered conditions and rearrangement for changes in earning capacity. *See generally* A.R.S. §§ 23-1044(F) (Supp.1988), 23-1061(H) (1983).

Fidelity relies on *Houston v. Industrial Comm'n,* 19 Ariz.App. 255, 506 P.2d 646 (1973), to support its proposition that since the claimant did not timely protest the March 1982 award of no lost earning capacity, res judicata applies to that award. Fidelity's reliance is misplaced. First, the claimant in *Houston* had no statutory right to reopen or rearrange a final average monthly wage determination, whereas the claimant here proceeded on a reopened claim that, when reclosed, required the Commission's current earning capacity assessment. *See generally* A.R.S. §§ 23-1044(F) (Supp.1988), 23-1047(A), (B) (1983). Second, it is unclear whether *Houston* involved mutual mistake; rather, this court merely assumed arguendo that the parties lacked authority to settle a disputed average monthly wage. *Id.* at 256, 506 P.2d at 647. *But cf. Safeway Stores, Inc. v. Industrial Comm'n,* 152 Ariz. 42, 48, 730 P.2d 219, 224 (1986) (permitting post-compensability settlements if approved by Industrial Commission).

Fidelity also argues that the estimate of earning capacity contemplated by the settlement was reasonable. While that may be true, it is not determinative on the issue of whether there was a mutual mistake of fact.

In summary, we conclude that mutual mistake was a material question of fact in the present case. The administrative law judge failed to address this question in the award. This failure to make a material finding is reversible error. *See, e.g., ASARCO, Inc. v. Industrial Comm'n,* 122 Ariz. 241, 594 P.2d 107 (App.1979). If the administrative law judge concludes that the settlement agreement was based on a mutual mistake of fact, the petitioner will be entitled to rearrangement retroactive to the date of the original no loss award.

Since the administrative law judge may find that the stipulated settlement was based on a mutual mistake of fact, we need not address the petitioner's final argument to the effect that it was unnecessary to establish fraud, coercion or mutual mistake to negate the "res judicata effect of a stipulation where the initial decision lacked any meaningful basis as to constitute prior litigation." In rejecting this argument, the administrative law judge, as we have observed, relied on *Gallegos,* saying "as long as the prior award is final, whatever was decided is final and so is every fact necessary to that decision." In so holding, the administrative law judge took no account of the fact that the finality *Gallegos* accords unprotested awards merely prevents a retroactive modification of those awards. We leave open two questions that may yet

surface if the administrative law judge finds that the stipulation as to no lost earning capacity was not based on a mutual mistake of fact. The first question is whether a prospective rearrangement, by which we mean rearrangement to date from the reclosing of the reopened claim, is available under *Gallegos,* if it is found that the stipulation was based upon an informed compromise of an unknown loss of earning capacity.

The second is whether a lost earning capacity award that arises from a stipulation is entitled to res judicata effect if the stipulation was not presented for Industrial Commission approval and shown to the satisfaction of the Industrial Commission to have an adequate factual basis. *Cf. Safeway Stores,* 152 Ariz. at 48, 730 P.2d at 224 (settlements must be entered "in the open" to be reviewed by the Commission).

The award is set aside.

FIDEL and SHELLEY, JJ., concur.